IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LORI DRING and<br>NANCY ASARO<br><br>                                    Plaintiffs<br><br>v.<br><br>ARIEL LAND OWNERS, INC.,<br>                                    Defendant | No. 3:15-CV-00478 ARC<br>(Judge A. Richard Caputo)<br><br>(ELECTRONICALLY FILED) |

## REPLY BRIEF OF DEFENDANT, ARIEL LAND OWNERS, INC. SUBMITTED IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

In this action, the Plaintiffs, Lori Dring and Nancy Asaro (Dring and Asaro) allege that the Defendant, Ariel Land Owners, Inc. (ALO) breached the terms of a Settlement Agreement entered into between the parties in the case of Ariel Land Owners, Inc. v. Lori Dring, et al., Civil Action No. 3:CV-01-0294 (M.D.Pa.)(the prior litigation). **The details of the Settlement Agreement and of the circumstance leading up to this litigation are set forth on pages 2-9 of the Brief of the Defendant, Ariel Land Owners, Inc. in Opposition to the Motion for Partial Summary Judgment of Plaintiffs, Lori Dring and Nancy Asaro, Document 55 filed on December 15, 2016 and need not be repeated here.**

Dring and Asaro allege in their Amended Complaint in this action that ALO breached the terms of the Settlement Agreement, in the prior litigation, by not attending a closing, scheduled by Dring and Asaro, for November 18, 2014 and by not performing its obligations under the Settlement Agreement at that closing.

ALO contends in its Motion for Summary Judgment that its failure to appear and perform at the closing did not constitute a breach of the Settlement Agreement. The Settlement Agreement required Dring and Asaro to transfer to ALO a parcel of property known as the north portion of the West Shore Strip and to obtain subdivision approval for that transfer. The Settlement Agreement further provided that the closing would occur sixty days after subdivision approval had been obtained. Dring and Asaro did not obtain the subdivision approval required by the Settlement Agreement. Therefore ALO contends in its motion for summary judgment that its failure to close was not a breach because (1) the time for closing had not yet occurred because Dring and Asaro had not obtained subdivision approval; (2) subdivision approval, a condition precedent to ALO's obligation to perform, had not been obtained; and (3) Dring and Asaro were not otherwise entitled to recover for breach of contract because they did not obtain subdivision approval.

Dring and Asaro make three arguments in their Brief in Opposition to the ALO Motion for Summary Judgment. First, they argue that the subdivision of the West Shore Strip had in fact been approved in 2001, five years before the Settlement Agreement was even entered into. Second, subdivision approval was not necessary because the subdivision dividing line between the north and south strip had been established in an 1872 deed. Third, they argue that they were

2

excused from the subdivision requirement because ALO repudiated the Settlement
Agreement.

**STATEMENT OF FACTS**
**THE CREATION OF THE WEST SHORE STRIP**

In his Opinion, in the prior litigation of January 18, 2008, Document 42
(Malakin Affidavit, Document 35, Exhibit B-1), Judge A. Richard Caputo made the
following factual findings as to the creation of the West Shore Strip.

1.  By deed dated December 13, 1859, and recorded in Wayne County
    Deed Book 28, page 36, George Cadwalder, Esquire, Executor of the
    Last Will and Testament of Mary Cadwalder, conveyed property
    owned by him along the west shore of Lake Ariel to Edward W.
    Weston.

2.  This deed included four hundred (400) acres of land bordering Lake
    Ariel and Mud Pond and lying upland of the natural western margin.

3.  By deed dated October 3, 1860, and recorded in Wayne County Deed
    Book 28, at page 92, Edward Weston deeded part of the four hundred
    sixty-four (464) acres to William Jones.  In the deed, the easterly
    boundary was described as the "high water mark along the water of said
    pond".

4.  By deed dated January 21, 1862, and recorded in Wayne County Deed
    Book 30, at page 39, Edward W. Weston deeded part of the four
    hundred sixty-four (464) acres to Joel Jones. This deed contains the
    following language: "Thence along the margin of the highest flow of
    water in Jones Pond leaving the land between the highest flow of
    water and its natural margin of said pond still belonging to Edward
    W. Weston". This conveyance specifically reserved to Edward W.
    Weston the land lying between the natural margin and the
    margin of the highest flow of water.

5.  By deed dated the same day, January 21, 1862, and recorded in
    Wayne County Deed Book 30, at page 40, Edward W. Weston
    conveyed part of the four hundred sixty-four (464) acres to Jeremiah

3

T. Barnes. This deed described the easterly boundary along Lake Ariel as: "Thence along the margin of the highest flow of water in Jones Pond and Marsh Pond . . ." The land between the natural margin and the highest flow of water remained in Edward W. Weston.

6.      By virtue of these conveyances, a strip of land between the natural margin of Lake Ariel and Mud Pond and high water mark or margin of the highest flow of water, was reserved to Edward W. Weston.[1]

Ariel Land Owners, Inc. v. Lori Dring, et al., 3:CV-01-0924 (M.D.Pa. January 18, 2008) pages 26-27.

The following map, which was introduced into evidence as defense Exhibit 51t, at the trial of the prior litigation, and which was included on page A001940 in the Appendix filed with the Court of Appeals, in said litigation, illustrates the location of the property conveyed by Weston to William Jones, Joel Jones and Jeremiah Barnes, as well as the location of the West Shore Strip, that Weston reserved to himself in those conveyances.

---

[1] In its Brief submitted in Support of its Summary Judgment Motion, Document 35, ALO took the position that the Weston to Jones, Jones and Barnes conveyances created the West Shore Strip in three parts. Since that time, an expert retained by Dring and Asaro explained in an expert report, that these conveyances created one strip rather than three strips because the strips were reserved to Weston and remained part of his land, without the necessity of a conveyance. ALO views this as a distinction without a difference. If the West Shore Strip is three separate parts, the Matthews property dividing property would divide the Jeremiah Barnes portion of the strip. If the West Shore Strip is one continuous parcel, the Matthews dividing line would require a division of the entire strip. In either case, subdivision approval would be required.

4



## DRING AND ASARO ACQUIRE THE WEST SHORE STRIP

In his Opinion, in the prior litigation, of January 18, 2008, Document 42,

Judge A. Richard Caputo also made the following findings concerning Dring and

Asaros' acquisition of the West Shore Strip.

7.   Edward W. Weston died October 28, 1891, and his estate was raised in the Lackawanna County Register of Wills Office to No. 2277 of 1891.

8.   As Edward W. Weston never conveyed the so-called west shore strip prior to his death, it devolved under his residuary estate to his wife, Susan W. Weston.

9.   Susan W. Weston died March 25, 1916, and her will was admitted to probate in Lackawanna County in the Register of Wills Office and indexed to No. 242 of 1916.

10.  Susan W. Weston did not convey the so-called west shore strip prior to her death, and since her will made no reference to the west shore strip as a specific devise, it passed under her residuary estate to her son, Charles W. Weston, and her daughter Caroline Weston Bird.

11.  Caroline Weston Bird died October 7, 1931, and her will was admitted for probate in Suffix County, Massachusetts to No. 251513 of 1931, recorded in Volume 1527, at page 42.

12.  As Caroline Weston Bird did not convey the so-called west shore strip prior to her death, and since her Last Will and Testament made no specific devise of the west shore strip, it devolved under her residuary estate to her brother, Charles W. Weston.

13.  Charles W. Weston died October 14, 1947, and his will was admitted to probate in Lackawanna County Register of Wills Office to No. 939 of 1947.

14.  As Charles W. Weston did not convey the so-called west shore strip

6

estate be divided one-third to Wells College of Aurora, New York, and two-thirds to Rensselaer Polytechnic Institute of Troy, New York.

15. Wells College conveyed its one-third interest in the so-called west shore strip to Lori Dring and Nancy Asaro by quitclaim deed dated December 6, 2001, and recorded in Wayne County Deed Book 931, page 204.

16. Rensselaer Polytechnic Institute conveyed its two-thirds interest in the so-called west shore strip to Lori Dring and Nancy Asaro by quitclaim deed dated November 2, 2001, and recorded in Wayne County Deed Book 1931, at page 209.

17. Neither Wells College nor Rensselaer Polytechnic Institute conveyed any interest to the so-called west shore strip prior to the conveyances to Lori Dring and Nancy Asaro.

21. Therefore, the ownership of the west shore strip south of the portion which was conveyed in the Settlement Agreement is vested in Lori Dring and Nancy Asaro.

*Id.* at 28-29

### THE WEST SHORE PROPERTY OWNERS ACQUIRE LAKE FRONT PROPERTIES

In the 140 years following, Weston's deeds to William Jones, Joel Jones and Jeremiah Barnes, the various individuals acquired lake front properties on the west shore of Lake Ariel and Mud Pond. The tax maps attached to the Second Supplemental Malakin Affidavit as Exhibit C and D filed with this Brief on January 23, 2017, show the location of the 85 properties along the west shore Lake Front. These properties extend completely across the lake front of the property conveyed from Weston to William Jones and completely across the lake front of the property conveyed from Weston to Joel Jones. These properties also extend, as Judge Caputo indicated in his Opinion of January 18, 2008, "well within the parcel

7

of land, originally conveyed from Weston to Jeremiah Barnes" Ariel Land Owners,

Inc. v. Lori Dring, et al., 3:CV-01-0924 (M.D.Pa. January 18, 2008) pages 6.

Exhibit G to the Affidavit of Theodore Malakin, Document 36, shows that the last

seven properties, along the west shore lake front, numbered 42-48 are in of the

original Jeremiah Barnes tract.

### DRING AND ASARO OBTAIN PROPERTY ON THE WEST SHORE OF LAKE ARIEL AND MUD POND

Dring and Asaro come into the West Shore picture on September 13, 1996.

On that date, they obtained a 52 acre parcel of land on the west shore of Lake Ariel

from Robert M. Swingle and Irene D. Swingle, his wife and Glenna J. Curtis and

Marian J. Swingle (Gawlas Affidavit, Document 53, Exhibit 1, page 22-23). This

52 acre parcel is on the shore line of Lake Ariel and Mud Pond (Malakin Affidavit,

Document 36, Exhibit B) and is part of the original parcel conveyed by Weston

Jeremiah Barnes in 1862 (Durkovic Supplemental Affidavit, Document 51

(Volume 3 as filed with Clerk's Office). The southeast corner of the 52 acre Dring

and Asaro tract borders on Lot 48, which as indicated above, is the dividing line

between the north and south strip (Malakin Affidavit, Document 36, Exhibit K).

Subsequently, on April 28, 1998, Dring and Asaro received and filed a

Corrective Deed for the 52 acre parcel that they obtained from Swingle and Curtis

on September 13, 1996 (Gawlas Affidavit, Document 53, Exhibit 1, page 25-28

(Volume 3 as filed with Clerk's Office)). The original deed from Swingle and

Curtis to Dring and Asaro contained a meets and bounds description, which reflects a boundary line along the high water mark on Lake Ariel and Mud Pond (Gawlas Affidavit, Document 53, Exhibit 1, pages 22-23) (Volume 3 as filed with Clerk's Office). The Corrective Deed described the property being conveyed to Dring and Asaro as being along the natural margin of Lake Ariel (Gawlas Affidavit, Document 53, Exhibit 1, page 25-28 (Volume 3 as filed with Clerk's Office)). Thus, the Corrective Deed purported to add to Dring and Asaros' property that property between the natural margin and the high water mark of Lake Ariel and Mud Pond.

The problem with a corrective deed is that Swingle and Curtis did not own the property between the high water mark and the natural margin of the Lake on April 28, 1998 when they purported to convey that property to Dring and Asaro. In fact, as Judge Caputo indicated in his Opinion of January 18, 2008, see pages 3-4 infra, that this property had been reserved by Weston in his conveyance to Jeremiah Barnes and, had become vested in Wells College and Rensselaer College (the Colleges) in 1947.

In May of 2011, approximately three years after obtaining the Corrective Deed from Swingle, but before obtaining title to the West Shore Strip from the Colleges, Dring and Asaro made an application with Lake Township to combine the property they obtained from Swingle in the original deed of 1996 and the Corrective Deed of 1998, with another 33.34 parcel of land, owned by Swingle,

9

bordering on the north side of their property (Malakin Affidavit, Document 36,

Exhibit B). The application does not reflect the Colleges of owners of the property.

Subsequently, in June of 2011, the application was approved (Dring and Asaro

Statement of Material Facts, Document 38, Exhibit 13). Dring and Asaro obtained

the West Shore Strip from the Colleges by deeds in November and December of

2001 (Gawlas Affidavit, Document 53, Exhibit 1, pages 29-33 (Volume 3 as filed

with Clerk's Office)).

## ARGUMENT

### THE LOT COMBINATION OF MAY AND JUNE OF 2011 DID NOT CONSTITUTE THE SUBDIVISION OF THE WEST SHORE STRIP, REQUIRED BY THE AGREEMENT OF AUGUST, 2006

Dring and Asaro now argue that the combination of the 2 lots they obtained

from Swingle constitute the subdivision of the West Shore Strip required by the

Settlement Agreement. The record in this case, however, belies this contention.

The application filed by Dring and Asaro in May of 2001, was governed by

the provisions of the Lake Township Subdivision and Land Development

Ordinance adopted on July 5, 1995. A copy of the pertinent provisions of this

Ordinance are included in the records as Exhibit D-1 to the Malakin Affidavit filed

December 15, 2016, Document 36. The Ordinance contains the following pertinent

provisions:

104 Jurisdiction

This Ordinance shall apply to all subdivisions and land developments made on or after the effective date of the Ordinance and not yet recorded, including mobile home parks and recreational land developments.

602 Glossary of Terms

**Developer** - The owner, or authorized agent of the owner; including but not limited to, any individual, partnership or corporation that undertakes and subdivision or land development or any of the activities covered by this Ordinance, particularly the preparation of a subdivision plan showing the layout of the land and the public improvements involved therein. The term "developer" is intended to included the terms "subdivider", even though the personnel involved in successive stage of this project may vary.

**Minor Subdivision** - A subdivision or development containing not more than ten lots, or a cumulative development on a lot-by-lot basis for a total of ten lots, of any original tract of land of record (i.e., not previously subdivided or developed subsequent to the effective date of this Ordinance, by the owner or the owner's duly appointed agent) where no streets or accesses are required. Use of the land is limited to a single-family dwelling. Minor subdivisions shall otherwise meet the definition of a "Supplement to  the Township Official Plan" as provided for in Chapter 71 of the Regulations of the Pennsylvania Department of Environmental Resources.

**Parcel** - An area of land resulting from the divisions of a tract of land for the purposes of transfer of ownership, use or improvement.

**Subdivision** - The division or redivision of a lot, tract or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot lines for the purpose, whether immediate or future, of lease, partition by the court for distribution to heirs or devisees, transfers of ownership or building or lot development, provided, however, that the subdivision by lease of land for agricultural purposes into parcels of more than ten acres, not involving any new street or easement of access or any residential dwelling, shall be exempted.

201 Procedures and Requirements for Minor Subdivisions

201.1 Application Requirements

Any person proposing to create a minor subdivision shall submit, along with plans required in 201.2 below, eight (8) copies of an application for minor subdivision approval. This application may be in letter form and shall specify and/or include:

    a.     The name, address and telephone number of the property owner of record and those of the subdivider, if different.

201.2 Plan Requirements

The subdivider shall submit eight (8) copies of the Final Plan and required supplementary data for the proposed subdivision. This plan shall be prepared by a Surveyor or Engineer and shall show all lots proposed to be created. The Final Plan shall meet the following requirements:

    b.     The names of all abutting property owners and the size of any remaining acreages in the tract from which lots are being taken shall be shown.

    c.     The map shall show the name of the municipality, name of the owner of record, North Point, graphic scale, and date.

    f.     Proposed lot or parcel lines shall be drawn to scale and dimensions given in feet and hundredths of a foot. Lot areas shall be shown in acres of square feet. The map shall depict the proposed subdivision as a part of the contiguous holdings of the subdivider, and show adjacent lots already taken from the parcel.

    j.     Tax map numbers and deed references shall be provided.

Malakin Affidavit Document 36, Exhibit D-1.

The plan submitted by Dring and Asaro, to Lake Township, in May of 2001, is included in the record as Exhibit B to the Malakin Affidavit, Document 36. It is also included in the record as Exhibit 13 to the Statement of Material Facts

12

submitted by Dring and Asaro, Document 38. An enlarged copy of the plan on which the reading is legible, has been submitted to the clerk's office. A review of this document, shows that it was not intended to be and did not constitute an application for the West Shore Strip subdivision.

As previously indicated in Sections 201.1 and 201.2 there are certain requirements for an application to subdivide property. These include: (a) the name, address and phone number of the property owner and those of the subdivider; (b) the names of all abutting property owners; (c) the size and description of any remaining acreage in the subdivided tract showing lot areas in terms of square feet; and (d) tax numbers and deed references.

The application filed by Dring and Asaro contained none of these elements. It does not include the name, address and phone number of the owner of the property being subdivided i.e. the Colleges. It does not include the names of all abutting property owners. In fact, it includes no names of any of the property owners abutting the north strip, it does not include the size or description of the remaining acreage in the subdivided tract. It does not include deed numbers or tax references.

The plan as approved by Lake Township is included in the record as Exhibit 13 to Dring and Asaros' Statement of Material Facts, Document 38. An enlarged and legible copy of the approval, has also been filed with the Clerk's Office. The approval plan is the same as the application plan with the exception of the approval

13

includes in the bottom left hand corner the signatures of the members of the Lake Township Planning Commission and Lake Township Board of Supervisors indicating their approval of the plan. It does not contain any of the information missing from the application plan. The only language on the plans indicating the nature of approval, is the following:

> From future conveyances of building purposes, parcel 1 must be combined with parcel 2 to form one new lot and cannot be subdivided, conveyed or sold separately apart therefrom without prior Township approval and the combined parcels should be known as Parcel 1R.

Thus, the plan is approved, simply does not reflect approval of the west shore subdivision.

Dring and Asaros' Statement of Material Facts, Document 38, Exhibit 13. Dring and Asaro also contend, that the north strip had been "acknowledged" as a separate parcel, as of the November 14 closing date and, that therefore, subdivision approval was not a necessary prerequisite for the closing. Dring and Asaro however, failed to cite any legal authority for the unique proposition that subdivision approval is not required by law and agreement, when it is "acknowledged".

Exactly what Dring and Asaro mean by "acknowledged" is unclear. In their brief, Dring and Asaro contend that the Wayne County Assessment Office assigned a tax number 12-302-0045.03 to the north strip, after the filing of the deeds from the Colleges in November and December of 2001. The record however, contains

14

no evidence supporting this contention. Moreover, any tax number assigned after the filing of the Colleges' deeds would have been for the entire West Shore Strip and not just the north part because the deeds from the Colleges from Dring and Asaro were for the entire West Shore Strip not just the north part because the Colleges owned the entire West Shore Strip (Gawlas Affidavit, Document 55, Exhibit 1, pages 29 through 33 (Volume 3 as filed with Clerk's Office)).

Dring and Asaro also contend that the tax assessment records for parcel 12-302-0045.003 were "updated" in June of 2014 when Dring and Asaro, without subdivision approval, conveyed to themselves the north part of the West Shore Strip (Gawlas Affidavit, Document 55, Exhibit 1, pages 9-18 (Volume 4 as filed with Clerk's Office). The record contains no evidence in support of this claim. Nonetheless, even assuming that the Tax Claim Bureau took the action that Dring and Asaro allege, ALO submits that there is no legal basis for the Court to conclude that the Tax Claim Bureau intended to or had the authority to waive the subdivision required by law and set forth in the Settlement Agreement.

Other documents in the Lake Township files also support the conclusion that the purpose of the 2001 application was to combine the parcels 1 and 2, rather than an attempt to subdivide any portion of the West Shore Strip. A description in the check submitted by Schoenagel, to Lake Township with the 2001 application, indicates in the description section "Swingle/Dring/Asaro Comb" (Malakin Second Supplemental Affidavit, Exhibit A filed with this Brief on January 23, 2017). In

15

addition, the comment letter received from the Wayne County Department of

Planning in response to the 2001 application was under the following heading:

> RE: Swingle subdivision. Parcel 2 (34.33 acres) addition to adjoining Parcel 1 (52.210 acres) to form one (1) new parcel containing 86.54 acres total.

(Malakin Second Supplemental Affidavit, Exhibit D filed with this Brief on

January 23, 2017).

Schoenagel himself described the application as a lot combination rather

than a request to subdivide the West Shore Strip. An Expert Report, submitted by

Dring and Asaro, dated and signed by Schoenagel on October 28, 2016, dealt with

Dring and Asaros' plans to develop their property on the west shore of Lake Ariel

and Mud Pond known as Parcel 1R since 2001. In said report, Schoenagel stated as

follows:

> The Asaro/Dring parcel is Parcel 1R as shown on a lot combination map of the lands of Robert M. Swingle, et. ux, et. al. and Nancy Asaro and Lori Dring dated May 4, 2001 and recorded at Plat Book 95 page 42, on May 26, 2001.

Malakin Second Supplemental Affidavit, Exhibit E, filed with this Brief on January 23, 2017.

The subsequent conduct of Dring and Asaro from 2001 forward also

supports the conclusion, that the 2001 approval did not constitute the West Shore

Strip subdivision approval, required by the Settlement Agreement. In August of

2006, Dring and Asaro voluntarily and with the advice of counsel, entered into the

Settlement Agreement, which required them to obtain subdivision approval to

divide the West Shore Strip (Malakin Affidavit, Document 36, Exhibit H). Shortly

thereafter, they hired Schoenagel, who filed an application seeking such approval

(Malakin Affidavit, Document 36, Exhibit I, J, K, L and M). In August of 2007,

they entered into an amended Settlement Agreement, which also required them to

obtain subdivision approval (Malakin Affidavit, Document 36, Exhibit O). On July

15, 2014, Dring and Asaros' counsel informed ALO's counsel albeit erroneously,

that subdivision approval for the West Shore Strip had been obtained (Malakin

Affidavit, Document 36, Exhibit P). ALO's counsel then informed Dring and

Asaros' counsel in writing that subdivision approval had not in fact been obtained

(Malakin Affidavit, Document 36, Exhibit S). The record contains no evidence that

Dring and Asaro responded or otherwise provide ALO with evidence of

subdivision approval.

On December 29, 2014, six months after Dring and Asaro had erroneously

informed ALO and five weeks after the closing unilaterally scheduled by Dring

and Asaro, they requested an opinion from the Township that subdivision approval

was not necessary. (Malakin Affidavit, Document 36, Exhibit T).

The Township, through its Solicitor, David Gromelski responded on January

27, 2015, indicating that subdivision approval was not required. Gromelski

indicated that the basis of the Township's conclusion was that the north part of the

West Shore Strip was a stand alone parcel (Malakin Affidavit, Document 36,

Exhibit U).

17

Subsequently, Gromelski determined that the north part of the West Shore Strip was not a stand alone parcel and that the proposed subdivision of the West Shore Strip into a north and south section would require a division of the West Shore Strip. (Malakin Affidavit, Document 36, Exhibit V).

On August 4, 2016, Gromelski wrote the following letter to Dring and Asaro counsel, Anthony Walton:

> I am writing in my capacity as Solicitor to Lake Township regarding issues that have arisen with respect to the above referenced property. You may recall that by letter dated December 29, 2014 you wrote to me inquiring as to whether this long and very narrow strip of land along the westerly shore of Lake Ariel (which I refer to as the "snake") needs subdivision approval in light of the survey detailing an it as an existing remnant parcel of land and not a new subdivision created from other parcel(s). We also understood from your letter that your inquiry was being made because your client was transferring the entire "snake" to Ariel Landowners, Inc. In light of these representations and understandings, I responded to your inquiry by letter dated January 27, 2015, indicating that the Township reviewed your request and concurred that the snake has always been a standalone parcel of land and thus and thus no subdivision approval was required.
>
> We have subsequently received information indicating that your clients intend to convey only a portion of the snake to Ariel Landowners, Inc. and retain ownership of a small portion of it. In fact, it appears, based on our research, that your clients have already filed a Deed essentially re-conveying a small portion of the "snake" to themselves.
>
> The Municipalities Planning Code ("MPC") defines the term "subdivision", in pertinent part, as "the division or redivision of a lot, tract or parcel of land by any means into two or more lots, tracts, parcels or other divisions of land including changes in existing lot lines for the purpose....of transfer of ownership...." In light of the fact that it appears that your client is now dividing the "snake" into

18

two separate parcels of land in order to transfer ownership, as opposed to conveying the entire parcel itself, subdivision approval would indeed be required for such division of land.

On a related note, please be advised that the Township recently discovered in their files a subdivision application that was submitted on your clients' behalf on January 13, 2007 addressing the very issue of dividing the snake into two separate parcels of land. Subsequently, by letter dated February 22, 2007, your clients' representative requested that the application be tabled and waived all time limits for action by the Township under the MPC. Thus, it appears the majority of work necessary to obtain subdivision approval for the partition of the "snake" has already been completed and applying for approval should place no undue additional burdens on your client.

Accordingly, by this correspondence Lake Township is formally requesting that your clients apply for subdivision approval for the division of the "snake" into two separate parcels of land.

I kindly ask that you please contact me at your earliest possible convenience to discuss further and advise as to how your clients intend to proceed. Thank you for your time and attention.

(Malakin Affidavit, Document 36, Exhibit V).

Dring and Asaro submitted expert reports in this matter on December 15, 2016. Included with their expert report, is a report from Anthony Waldron, dated October 28, 2016 (Gawlas Affidavit, Document 53, Exhibit 1). This report is the first indication, in this record, that Dring and Asaro were taking the position that the 2001 lot combination approvals constituted subdivision approval for the West Shore Strip.

Dring and Asaro have also offered the expert testimony of Anthony Waldron that the 2001 application and approval constituted the West Shore Strip subdivision

19

approval as evidence to avoid summary judgment. It has been held however, that "mere gainsaying by an expert contrary to law and unsupported by fact, will not avoid summary judgment where otherwise appropriate". *I.B.E.W. Local Union 380 Pension Fund v. Buck Consultants*, 2008 WL 269 467 (E.D.Pa 2008) page 5; *United States v. 294 Various Gambling Devices*, 718 F. Supp. 1236, 1241-42 (W.D.Pa.1989). As Will Rogers was known to say: "it ain't what you don't know that gets you into trouble, it's what you know for sure that just ain't so". ALO respectfully submits that the record in this case, supported by the arguments in this brief, demonstrate that there is no factual support for Mr. Waldron's claim and, that therefore, his testimony is "just ain't so" not sufficient to avoid summary judgment.

Based on the above, ALO contends that no reasonable jury could conclude that the Dring and Asaros' 2011 application/approval to Lake Township, constituted approval of the west shore subdivision required by the Settlement Agreement, six years later. A review of the application and information submitted therein, can only lead one to conclude that Dring and Asaro were requesting joinder of their two lots on the west shore, rather than subdivision of the West Shore Strip. The approval itself, contains no language indicating an approval of the West Shore Strip subdivision. Rather, it reflects only approval of the joinder of the Dring and Asaro and Swingle properties. Schoenagel, who was retained by Dring and Asaro to submit the 2001 application, has described it as a lot combination and

not a West Shore Strip subdivision approval. The County Planning Commissions'
review of the application reflects that they reviewed it as a combination, rather
than a request to subdivide the West Shore Strip. Subsequent conduct by Dring and
Asaro, which includes agreeing to subdivide the West Shore Strip, applying for
such approval, acknowledging their obligation to obtain such approval, and
attempting to mislead ALO's counsel, as well as the Township Solicitor,
concerning the approval obligation is inconsistent with the position that they now
take 15 years later that the 2001 approval constituted the subdivision approval
required by the Settlement Agreement.

### The dividing line for the West Shore Strip subdivision, as required by the Settlement Agreement, was not established in 1872.

Dring and Asaro also claim that the subdivision approval was not required
because "the same line that separates the south strip from the north strip, on the
approved 2001 plan is for a separation line for the lake front parcels established in
1872."

Dring and Asaro failed to identify in their brief a particular deed or
conveyance, which established the separation line in 1872. Moreover, the claim
that such a line was created in 1872 is contrary to the previous decision of Judge
Caputo in the prior litigation, as well as the deeds on record at the Wayne County
Courthouse.

21

In his Opinion of January 18, 2008, Judge Caputo concluded that Edward W. Weston obtained 400 acres of land, bordering Lake Ariel and Mud Pond and lying upland of the natural western margin from George Cadwalder, Executor on December 13, 1859. Weston conveyed part of the 400 acres to William Jones by deed dated October 3, 1860, part to Joel Jones by deed dated January 21, 1862 and part to Jeremiah Barnes by deed also dated January 21, 1862. In these conveyances, Weston reserved to himself, a strip of land, between the natural margin of Lake Ariel and Mud Pond and the high water mark and the margin of the highest flow of water (see pages 3-4).

Judge Caputo further concluded that neither Weston nor his heirs, made any conveyance of the West Shore Strip between 1860 and 1947, at which time, the West Shore Strip was vested in the Colleges who, in 2001 then conveyed the West Shore Strip to Dring and Asaro. *Id at 4-6.* Judge Caputo also concluded that paragraph 2 of the Settlement Agreement provided that Dring and Asaro agreed to subdivide the West Shore Strip along with property line of Lot 48, block owned by Marian Gillespie and that said subdivision line falls well within the parcel of land conveyed by Weston to Jeremiah Barnes. *Id at 6.*

Judge Caputo's conclusions find support of the Supplemental Affidavit of David Durkovic, Document 51, which sets forth the chain of title from Weston to Jeremiah Barnes to both Gillespie and Dring and Asaro. The Durkovic Affidavit shows that both the Gillespie and the Dring and Asaro properties, and the dividing

22

line between them are included in the Jeremiah Barnes section of the West Shore Strip. What is now known as the Gillespie property remained part of the same parcel until May 15, 1950, when the then owner, Spencer Swingle et. ux, conveyed the Gillespie property to Richard Bynon and Neil Bynon. Subsequently, the property became vested in Gillespie in December of 1996 (Durkovic Affidavit, Document 36).

Based on the above, Dring and Asaro submit that there are no facts in this record from which a reasonable jury could conclude that the Gillespie dividing line had been established in 1872. Indeed, the Gillespie dividing line is within the West Shore Strip. Judge Caputo has held that there were no conveyances of any part of the West Shore Strip, prior to the 2001 conveyance to Dring and Asaro. Therefore, the contention that the dividing line was established in 1872, is directly contradicted by Judge Caputo's January 18, 2008, Opinion which is binding on Dring and Asaro.

### Dring and Asaros' obligation to subdivide the West Shore Strip was not waived or excused by ALO's alleged repudiation of the Settlement Agreement.

Dring and Asaro also allege that their obligation to subdivide the West Shore Strip was waived or excused by reason of a repudiation, of the Agreement by ALO. **ALO's response to the repudiation claim is contained in its Brief submitted in Opposition to Dring and Asaros' Motion for Partial Summary Judgment, Document 55, pages 14-19 and need not be repeated here.** Nonetheless, there

has been one development since that date that supports ALO's claim that the

problems that developed with respect to Cardinal Lane did not constitute an

absolute and unequivocal repudiation of the contract. As is been indicated

elsewhere in this record, the dispute between Culotta and ALO over Cardinal Lane

is the subject of the litigation in the Court of Common Pleas of Wayne County

(Malakin Supplemental Affidavit, Document 50, Exhibits A-H). Recently, senior

judge Robert Conway of that court, considered and denied Culotta's Motion for

Summary Judgment in that case (Malakin Second Supplemental Affidavit Exhibit

F).

As indicated in its Brief in Opposition to Dring and Asaros' Motion for

Partial Summary Judgment, Document 55, a party to a contract, who believes that

the other party repudiated its obligations has a number of available options. First,

the non-repudiating party may elect to place the other party in immediate breach.

*Total Control, Inc. v. Danaher Corporation*, 359 F. Supp 2d 387, 393-94 (E.D.

2005); *Simon Wrecking Company, Inc. v. AIU Insurance Company*, 350 F.Supp 2d

624, 634-35 (E.D.Pa 2004); *Lane Enterprises, Inc. v. L.B. Foster Company*, 700

A2d, 465, 473-75. To justify the election of such a remedy there must be an

absolute, unequivocal refusal to perform or a distinct and positive statement of an

inability to do so by the other party. *Edwards v. Wyatt*, 335 Fed 3d. 261, 272 (3rd

Cir. 2003); *Oakridge Construction Company v. Roy Tolly*, 504 A 2d. 1443, 1346-7

24

(Pa. Super 1985). The record is clear that Dring and Asaro did not elect this remedy and did not allege that they had done so in their Amended Complaint.

The second available remedy is for the non-breaching party to ask for adequate assurance of performance. *Total Control, Inc. v. Danaher Corporation*, 359 F. Supp 2d 387, 393-94 (E.D. 2005); *Simon Wrecking Company, Inc. v. AIU Insurance Company*, 350 F.Supp 2d 624, 634-35 (E.D.Pa 2004); *Lane Enterprises, Inc. v. L.B. Foster Company*, 700 A2d, 465, 473-75. If adequate assurance is not given, the non-breaching party <u>may</u> treat it as a repudiation and suspend performance. *Lane Enterprises, Inc. v. L.B. Foster Company*, 700 A2d, 465, 473-75; Restatement of the Law of Contracts, Second §251(2). Dring and Asaro did not choose this option either.

A third option is for the injured party to decline to declare a repudiation and treat the contract as remaining in force. *McCormick v. Casualty Company of New York*, 161 A. 532 (Pa 1932); see also *Franconia Associates v. United States*, 122 S.C.t. 1993, 2002 (2002). In re: *Red Rock Services Company, LLC,* 522 B.R. 551, 565 (E.D Pa. 2014)(Maryland Law); In re: *Broadstripe, LLC v. Millennium Digital Media Systems, LLC,* 435, B.R. 245, 257-258, (D. Delaware 2010)(Delaware Law); Farnsworth on Contracts (3rd Addition), Section 8.22, pages 565-571. Dring and Asaro elected this option and scheduled the closing. Dring and Asaros' choice of remedy is clear from their counsel's letter to ALO of October 14, 2014 (Malakin Affidavit, Document 36, Exhibit R) wherein, counsel stated:

25

565 (E.D Pa. 2014)(Maryland Law); In re: *Broadstripe, LLC v. Millennium Digital*

*Media Systems, LLC,* 435, B.R. 245, 257-258, (D. Delaware 2010)(Delaware

Law); Farnsworth on Contracts (3rd Addition), Section 8.22, pages 565-571. Dring

and Asaro elected this option and scheduled the closing. Dring and Asaros' choice

of remedy is clear from their counsel's letter to ALO of October 14, 2014 (Malakin

Affidavit, Document 36, Exhibit R) wherein, counsel stated:

> The second purpose of this correspondence is to notify you that my
> clients are ready, willing and able to perform their obligations under the
> Settlement Agreement. You are hereby notified that my clients herby make
> TIME OF THE ESSENCE for closing to take place at the offices of Rosenn,
> Jenkins & Greenwald, LLP, 15 South Franklin Street, Wilkes-Barre, PA
> 18711 on November 18, 2014 at 9:00 a.m. At the aforementioned closing I
> will tender the deeds, including the deed required by paragraph 4 of the
> Settlement Agreement which is a Quit Claim Deed to ALO allowing ALO to
> maintain the waters of Lake Ariel, Mud Pond and the channel connecting
> them up to an elevation of 1,425.9 feet above sea level over the South Strip
> and/or the lands of my clients and the deed required by paragraphs 2 and 3
> of the Settlement Agreement which is a Quit Claim Deed to ALO of all the
> right, title and interest of my clients to the North Shore Strip subject to a
> permanent easement in favor of the Property Owners as required by the
> Settlement Agreement.
>
> In the event you are not ready, willing and able to perform your
> obligations under the Settlement Agreement, my clients will declare you to
> be in breach of the Settlement Agreement, and all rights and remedies are
> reserved in favor of my clients. Please be guided accordingly.

They then instituted this action claiming in their Amended Complaint, that

ALO had repudiated the Agreement by not performing at the scheduled closing.

Thus, because Dring and Asaro did not elect the repudiation remedy, and did not

plead it in its Complaint, ALO submits that Dring and Asaro cannot claim repudiation as a basis to avoid summary judgment against them.

ALO also submits that Dring and Asaro cannot avoid summary judgment on the grounds of ALO's alleged repudiation because the record in this case is clear that they did not intend to obtain the subdivision approval had the alleged repudiation not occurred. **This argument is set forth on pages 18 and 19 of ALO's Brief in Opposition to Dring and Asaros' Motion for Partial Summary Judgment, Document 55, and need not be repeated here again.**

### CONCLUSION

The issue in this case, as framed by the Amended Complaint, is simply whether ALO breached the Settlement Agreement by failing to appear and perform at the November 18, 2014 closing. The record is clear however, that Dring and Asaro had not performed their obligations to obtain West Shore Strip subdivision approval, which was not only a condition precedent to ALO's performance but also established the time at which ALO was obligated to perform. Dring and Asaros' obligation to obtain West Shore Strip subdivision approval was not waived or excused. Therefore ALO is entitled to summary judgment on the claim set forth in the Amended Complaint that it breached the Settlement Agreement by not appearing and performing at the November, 2014 closing.

Respectfully submitted,

/s/ Joseph A. O'Brien
Joseph A. O'Brien, Esq.
Attorney I.D. No.: 22103
OLIVER, PRICE & RHODES
1212 S. Abington Road, PO Box 240
Clarks Summit, PA 18411
Phone: (570) 585-1200
Fax: (570) 585-5100
Email: jaob@oprlaw.com

## CERTIFICATE OF SERVICE

I, **JOSEPH A. O'BRIEN, ESQUIRE**, of Oliver, Price & Rhodes, hereby certify that on this date, I caused the foregoing REPLY BRIEF via the Court's ECF system on all counsel of record as authorized under Federal Rule 5(b)(2)(E) and local rule 5.6 of the United States District Court for the Middle District of Pennsylvania. I further certify that all counsel of record in the case, but for the Plaintiff, are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Rosenn, Jenkins and Greenwald, LLP
Garry S. Taroli, Esquire
Robert N. Gawlas, Jr., Esquire
15 South Franklin Street
Wilkes Barre, PA   18711-0075

Michael Profita, Esquire
500 Frank W. Burr Blvd., Suite 31
Teaneck, NJ 07666

/s/Joseph A. O'Brien
Joseph A. O'Brien, Esquire

P:\O'BRIEN, JOE\ARIEL LAND OWNERS\D&A vs. ALO-478-Current\Pleadings\Reply Brief to Motion for Sum Judg.docx